563 S.E.2d 359

**CARJOW, LLC, Respondent,**

v.

**Rev. John D. SIMMONS, Appellant.**

**No. 3493.**

Court of Appeals of South Carolina.

Submitted April 8, 2002.

Decided May 13, 2002.

516

_____

Robert L. Gailliard, of Charleston, for appellant.

William J. Hennessy, Jr., of Dodds & Hennessy, of Charleston, for respondent.

HEARN, C.J.:

After purchasing the New Hope Pentecostal Holiness Church (New Hope) at a foreclosure sale, Carjow, LLC brought this action to recover possession or the equivalent value of church pews and ceiling fans/lights. It also sought

damages for lost rent caused by their removal. The master-in-equity found that the pews and ceiling fans/lights were fixtures and granted Carjow its requested relief. Rev. John Simmons, the former pastor, appeals. We affirm.

## FACTS

In April 1987, New Hope purchased a church building at 5801 Robinson Street in Hanahan, South Carolina. The First Federal Savings & Loan Association of Charleston (Bank) financed the purchase. Rev. Simmons testified that the pews were obtained in a separate transaction.[1]

In 1989, Hurricane Hugo damaged the church. At that time, the pews were unfastened from the floor and moved around the room to avoid water drips and allow for repairs to the ceiling.[2] Rev. Simmons testified that they moved the pews to avoid leaks "[e]very time it rained" but "when we put it back down, we put it back down like we took it up" and the intention was that the pews would eventually be reattached.

In 1999, the Bank began foreclosure proceedings on the property. Frances B. Kerr appraised the property for the Bank. He made drawings and took pictures showing the pews and ceiling fans/lights inside the sanctuary. Kerr testified he did not check to see if the pews were fastened to the floor; however, he testified that his appraisal included the pews and ceiling fans/lights.[3] Walter Carr, a member of Carjow, testified he inspected the outside of the property but acknowledged that he did not go inside. Instead, he received some of the appraisal documents including the pictures of the church's interior.

After being told by the Bank to vacate the premises, Rev. Simmons removed the pews and the ceiling fans/lights. Since

---

1. Rev. Simmons testified he installed an air conditioning unit in the church before the sale, and, in exchange, the prior owner of the church property agreed not to remove the pews which were attached to the floor with "L" brackets.

2. Photographs in the record of the empty sanctuary show markings on the floor including holes and some brackets where the pews had been.

3. He estimated the pews were worth $28,000 to $30,000 depreciated to $20,000.

then, he has stored the pews at his new church and the ceiling fans/lights at his house. On May 8, 1999, Carjow purchased the Church for $125,001.00. When Carr entered the church premises, he observed that the pews and ceiling fans/lights were missing.

Carr demanded Rev. Simmons return the pews and ceiling fans/lights. Rev. Simmons testified Carr offered $2,500 for the return of the pews, and Rev. Simmons countered with an offer of $3,500 which was refused. On September 1, 1999, Carjow rented the premises to the Church on the Rock. However, because the facility had no pews or ceiling fans, Carjow and its tenant reached a subsequent agreement reducing the rent by $366 per month "until such time as those items are recovered." When the pews were not returned, Carjow initiated this action.

The matter was referred to the master by consent of the parties. At the hearing, Carr presented evidence that the replacement cost of the pews was $27,438.45 and the replacement cost of comparable ceiling fans/lights was $154.71 each, excluding $50 per fixture for installation. The master found that the pews and the ceiling fans/lights were fixtures of the church and ordered Rev. Simmons to return them and that Carjow be awarded $5,490.00 for lost rent and $400.00 for the cost of reinstalling the ceiling fans/lights. He further provided if Rev. Simmons refused to return the fixtures, Carjow would be granted an additional $21,000.00 for the replacement cost of the fixtures. Rev. Simmons appeals.

## DISCUSSION

### I. Fixtures

Rev. Simmons argues that the pews and the ceiling fans/lights removed from the property were not fixtures. In this case, we disagree.

In determining whether a particular action sounds in law or equity, this court must discern the main purpose of the action, generally from the body of the complaint. *Ins. Fin. Servs., Inc. v. S.C. Ins. Co.*, 271 S.C. 289, 293, 247 S.E.2d 315, 318 (1978); *see* Jean Hoefer Toal, Shahin Vafai & Robert A. Muckenfuss, *Appellate Practice in South Carolina* 188 (1999).

Based on our reading of the complaint, we find this action's main purpose is to recover the pews or their equivalent value plus any other damages caused by Rev. Simmons's detention of the property. Therefore, we believe this action is appropriately analyzed as a conversion action seeking damages. *See Oxford Fin. Cos. v. Burgess,* 303 S.C. 534, 539, 402 S.E.2d 480, 482 (1991) ("A claim for conversion can be based on an unauthorized detention of property, after demand."). "An action for damages for conversion is an action at law." *Blackwell v. Blackwell,* 289 S.C. 470, 471, 346 S.E.2d 731, 732 (Ct.App.1986). As such, we must affirm the master's order if any evidence reasonably supports his factual findings. *Id.; accord Townes Assocs. v. City of Greenville,* 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976) ("In an action at law, on appeal of a case tried without a jury, the findings of fact of the judge will not be disturbed upon appeal unless found to be without evidence which reasonably supports the judge's findings.").

▮▮▮ The determination whether or not an item is a fixture is a mixed question of law and fact. *Carson v. Living Word Outreach Ministries, Inc.,* 315 S.C. 64, 70, 431 S.E.2d 615, 618 (Ct.App.1993). "It is incumbent on the court to define a fixture, but whether it is such in a particular instance depends upon the facts of that case, unless the facts are susceptible of but one inference." *Id.* South Carolina courts have defined a fixture as "an article which was a chattel, but by being physically annexed to the realty by one having an interest in the soil becomes a part and parcel of it." *Id.* Mere affixation does not automatically render property a fixture. *Creative Displays, Inc. v. S.C. Highway Dep't,* 272 S.C. 68, 72, 248 S.E.2d 916, 917 (1978). We find the converse is also true—severance of an item for some temporary purpose will not change its character from a fixture back to personal property. *See* 35A Am.Jur.2d *Fixtures* § 110 (2001). In determining whether an item is a fixture, courts should consider the following factors: "(1) mode of attachment, (2) character of the structure or article, (3) the intent of the parties making the annexation, and (4) the relationship of the parties." *Hyman v. Wellman Enters.,* 337 S.C. 80, 84, 522 S.E.2d 150, 152 (Ct.App. 1999).

The master, citing *Carson,* applied the correct definition and test for determining whether an item is a fixture. According-

ly, even if this court might have reached a different result based on its view of the evidence, we must affirm if there is any evidence supporting his factual determination that this test was met. Mode of attachment, character of the property, and relationship of the parties are not disputed. Therefore, our analysis hinges on the intent of the parties.

With respect to the ceiling fans/lights, these items were attached to the property at the time of the sale and were necessary for the comfort of the building's occupants. The record reflects an assumption by the purchaser and the appraiser that these items would stay in place after the sale. Therefore, we find that the evidence supports the master's determination that these items were fixtures. *See Equibank v. United States,* 749 F.2d 1176, 1180 (5th Cir.1985) ("[A] lamp which is simply plugged into a socket is a[sic] movable and may be removed from a residence without violating the mortgage, but an installed light fixture, be it an expensive, antique chandelier or a garden-variety fixture, becomes a component part of the building.").

Regarding the pews, we decline to hold that this type of property is a fixture as a matter of law. Instead, we look to the facts of this case. It is undisputed that the pews were physically attached to the church building when New Hope bought the property. Moreover, the only reason the pews were detached from the floor was because of hurricane damage, and Rev. Simmons testified that the intention was always that they would reattach the pews. Carr testified that the pew locations were clearly marked by the portions of the sanctuary floor that were not faded by sunlight and that some holes and brackets still marred the floor.

We find the analysis of *Sims v. Williams,* 441 S.W.2d 385 (Mo.Ct.App.1969) persuasive here. In *Sims,* the trustees of a church sought to recover eighteen church pews which were removed from the property. The respondent, who purchased the church building in a foreclosure sale, claimed the pews as fixtures. The trial court agreed and the appellate court affirmed, finding the clear intention was that the pews became a part of the church property. "They were built for this church and installed therein to be a part of and complete the

church. They were bolted to the floor in such manner that their removal damaged the floor of the building." *Id.* at 387.

■ Based on the above, we find there is evidence supporting the trial court's ruling that the pews were fixtures and affirm.

## II. Damages for Lost Rental Income

Rev. Simmons next argues Carjow is not entitled to damages for loss of rental income caused by the removal of the pews because the purported loss was based on a negotiated agreement and "speculative at best." We disagree.

■ Actual damages are awarded to compensate for proven injury or loss. Black's Law Dictionary 394 (7th ed. 1999). Here, Carr testified he was leasing the church building to the Church of the Rock. He testified that the monthly rent of the facility with ceiling fans/lights and the pews would be $1,592.00. Without these fixtures, however, Carr testified the property only rented for $1,226.00 per month. Rev. Simmons did not present evidence that these values were inaccurate.

■ As a property owner, Carr was competent to give his opinion as to the property's rental value and his damages. *See Seaboard Coast Line R.R. v. Harrelson,* 262 S.C. 43, 46, 202 S.E.2d 4, 5 (1974) ("[A] landowner, who is familiar with his property and its value, is allowed to give his estimate as to the value of the land and damages thereto, even though he is not an expert."). Here, the master accepted Carr's estimate regarding his damages for lost rent. We give deference to the master's factual findings because he had a better vantage point from which to judge the witnesses' credibility. *See McDuffie v. O'Neal,* 324 S.C. 297, 306, 476 S.E.2d 702, 706 (Ct.App.1996). "[T]he conclusions of the master who observed the demeanor and appearance of the witnesses have peculiar value on questions of credibility of witnesses." *Patterson v. Goldsmith,* 292 S.C. 619, 626, 358 S.E.2d 163, 167 (Ct.App. 1987). Accordingly, we affirm the master's award as an appropriate measure of Carjow's damages for lost rent.

**AFFIRMED.**

GOOLSBY and HOWARD, JJ., concur.